UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------- X
ALAN CATANEO,

              Plaintiff,         **NOT FOR PUBLICATION**

    -against-            **MEMORANDUM & ORDER**

MICHAEL J. ASTRUE,        11-CV-2671 (KAM)
Commissioner of Social Security

              Defendant.
-------------------------------- X
**MATSUMOTO, United States District Judge:**

        Pending before the court are the parties' cross-motions for judgment on the pleadings.  Plaintiff Alan Cataneo suffers from post-traumatic stress disorder related to his service in the Vietnam War.  In order to receive Social Security disability benefits, plaintiff must show that he became disabled after he retired in October 1990, but before he last met the insured status requirements for Social Security disability benefits in December 1995.  In a May 7, 2009 decision, the Administrative Law Judge found on remand, and the Commissioner of Social Security determined, that plaintiff was not disabled by post-traumatic stress disorder or any other condition prior to January 11, 2005.  For the reasons stated below, the court denies the parties' cross-motions for judgment on the pleadings and remands this case for further administrative proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Plaintiff filed for Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI") on January 11, 2005. (Tr. at 45-46.)  He alleged disability since October 17, 1990, due to post-traumatic stress disorder ("PTSD"), irritable bowel syndrome ("IBS"), high blood pressure, a benign prostate problem, tinnitus, bilateral hearing loss, cranial nerve injury, and a back injury. (*Id.*)  The Social Security Administration ("SSA") denied plaintiff's claim on March 4, 2005, upon a determination that plaintiff was not disabled. (*Id.* at 26.)

On March 28, 2005, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to contest the SSA's determination of non-disability. (*Id.* at 30.)  He appeared *pro se* before ALJ Peter F. Crispino on January 30, 2006. (*Id.* at 204).  Subsequently, on April 12, 2006, ALJ Crispino issued a "partially favorable" decision, finding that although plaintiff was disabled as of January 11, 2005, for SSI purposes, he was not disabled as of December 31, 1995, the date when plaintiff last met the insured status requirements for DIB. (*See id.* at 16, 19-20, 29.)

As an initial matter, ALJ Crispino determined that plaintiff had not engaged in significant gainful employment since his alleged disability onset date (October 17, 1990) and

2

that plaintiff's PTSD constituted a "severe impairment" since his alleged disability onset date; however, ALJ Crispino found that because the impairment was not among or medically equivalent to the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1, plaintiff was not *per se* disabled. (*Id.* at 16-17.)  With respect to the residual functional capacity ("RFC") determination, ALJ Crispino found that prior to January 11, 2005, plaintiff had the RFC to perform his past relevant work as a firefighter and fire marshal. (*Id.* at 18.)  ALJ Crispino also found, however, that because plaintiff's nonexertional limitations (*i.e.*, PTSD) compromised his ability to perform work at all exertional levels as of January 11, 2005, plaintiff was disabled as of that date. (*Id.* at 19.)

Plaintiff requested review of ALJ Crispino's decision from the Appeals Council. (*Id.* at 4.)  When the Appeals Council denied review on December 19, 2007, ALJ Crispino's decision became the final decision of the Commissioner of Social Security ("Commissioner"). (*Id.*)  Plaintiff subsequently filed suit in the United States District Court for the Eastern District of New York (*see Cataneo v. Astrue*, No. 08-CV-0758 (CBA)), and on September 26, 2008, the parties entered into a Stipulation and Order, whereby the Commissioner's April 12, 2006 decision was reversed, and plaintiff's claim was remanded for further administrative proceedings. (*Id.* at 262-64.)

3

Pursuant to the September 26, 2008 Stipulation and Order, the Appeals Council vacated the Commissioner's decision and remanded the case for a new hearing before an ALJ. (*Id.* at 260.) Specifically, the Appeals Council held that, in rendering his decision, ALJ Crispino had failed to conduct a "function-by-function" assessment of plaintiff's mental condition and also failed to properly consider the lay testimony of plaintiff's wife and Robert Mauro, plaintiff's former supervisor. (*Id.*) The Appeals Council ordered the ALJ to correct these errors on remand and determine the extent of plaintiff's mental impairment between plaintiff's alleged disability onset date (October 17, 1990) and the last date plaintiff qualified for DIB (December 31, 1995) (the "Relevant Period"). (*Id.* at 261.)

Plaintiff appeared before ALJ David Ettinger on March 17, 2009, represented by plaintiff's current counsel of record. (*Id.* at 596.) During the hearing, ALJ Ettinger received testimony from plaintiff, Dr. Carlos Jusino, a medical expert, and Melissa Fass-Karlin, a vocational expert. (*Id.* at 597, 623, 630.) On May 7, 2009, ALJ Ettinger issued an "unfavorable" decision, holding that plaintiff was not disabled during the Relevant Period because he retained the RFC to perform certain jobs prevalent in the national economy. (*Id.* at 243, 255-56.)

In his decision, ALJ Ettinger reaffirmed the Commissioner's previous finding that although plaintiff had a

4

severe impairment due to PTSD during the Relevant Period, this impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1. (*Id.* at 249; *see* 20 C.F.R. § 404.1525.)  The latter determination was based on the fact that plaintiff did not have sufficient "marked"[1] limitations to satisfy the statutory criteria. (Tr. at 250.)

With respect to plaintiff's RFC during the Relevant Period, which is based on the functional limitations imposed by plaintiff's PTSD during that time, ALJ Ettinger first considered the available medical testimony.  In doing so, ALJ Ettinger rejected the expert testimony of Dr. Jusino, who testified that he could not diagnose plaintiff with PTSD during the Relevant Period due to plaintiff's drug and alcohol use and plaintiff's failure to seek professional treatment until 2002. (*Id.* at 252, 624.)  Instead, based on the opinion of Dr. Herbert Stein (plaintiff's treating physician), ALJ Ettinger found that plaintiff had suffered from PTSD since October 17, 1990. (*Id.* at 252.)  Nevertheless, ALJ Ettinger determined that Dr. Stein's medical opinion did not state that plaintiff was unable to perform other, non-firefighting jobs during the Relevant Period

---

[1] "A 'marked' impairment 'may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the individual's ability to function independently, appropriately, effectively, and on a sustained basis.'" *McAninch v. Astrue*, No. 09-CV-0969, 2011 WL 4744411, at *8 n.8 (W.D.N.Y. Oct. 6, 2011).

and that Dr. Stein found that plaintiff's PTSD symptoms were
exacerbated by the September 11, 2001 attacks, suggesting that
plaintiff's PTSD symptoms were not sufficiently limiting during
the Relevant Period to render him disabled. (*Id.* at 254.)

        In addition, ALJ Ettinger considered and ultimately
discredited the lay testimony of plaintiff, plaintiff's wife,
and plaintiff's former supervisor with respect to the
limitations imposed by plaintiff's PTSD during the Relevant
Period.  ALJ Ettinger concluded that plaintiff and his
corroborating witnesses did not "intentionally ma[k]e any
intentionally inaccurate statements." (*Id.* at 253.)
Nevertheless, ALJ Ettinger found that each of the witnesses
lacked credibility because: (i) all of plaintiff's witnesses
were motivated to support plaintiff's claim; (ii) plaintiff's
twenty-two year work history and eligibility for a potential
promotion were inconsistent with plaintiff's purported "extreme
behavioral problems"; and (iii) most significantly, plaintiff
did not seek professional treatment for his impairment until
2002. (*Id.* at 253-54.)  ALJ Ettinger also noted that, had
plaintiff's witnesses been "fully credited . . . a far more
restrictive [RFC]" would result. (*Id.* at 252.)

        Based on the foregoing, ALJ Ettinger determined that
plaintiff did not have the RFC to perform his past relevant work
as a firefighter or fire marshal after October 1990 but found,

as Ms. Fass-Karlin testified, that there were other jobs prevalent in the national economy that could be performed by an individual with plaintiff's RFC. (*Id.* at 254-55.)  Consequently, ALJ Ettinger ultimately concluded that plaintiff was not disabled during the Relevant Period. (*Id.* at 256.)

Plaintiff appealed ALJ Ettinger's decision to the Appeals Council on March 19, 2010. (*Id.* at 224.)  He also submitted new evidence to the Appeals Council, including a January 20, 2010 letter from his treating physician, Dr. Stein, and his therapist, Barbara Simmons. (*Id.* at 228.)  Subsequently, on April 1, 2011, the Appeals Council issued a letter indicating that it had "no reason under [its] rules to assume jurisdiction" over plaintiff's case. (*Id.* at 221.)  ALJ Ettinger's decision thus became the final decision of the Commissioner. (*Id.*)

Plaintiff commenced the instant action on June 3, 2011 pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (ECF No. 1, Complaint dated 6/2/2011 ("Compl.").)  The Commissioner moved for judgment on the pleadings on January 23, 2012, and plaintiff cross-moved for the same on March 6, 2012.  In the alternative, plaintiff requested that this case be remanded to the Commissioner for further administrative proceedings to establish the correct onset date of plaintiff's disability.

## FACTS

**I.   Personal Life**

Plaintiff was born on Staten Island on August 3, 1945. (Tr. at 34, 346.)  He describes an idyllic childhood; he had friends and enjoyed life. (*Id.* at 346.)  Plaintiff graduated from high school and attended two years of college under the GI Bill, receiving an associate's degree from Staten Island College in approximately 1983. (*Id.* at 53, 208, 347.)

Plaintiff married his first wife immediately after his return from the Vietnam War, and they divorced approximately two-and-a-half years later. (*Id.* at 345.)  In 1992, plaintiff married Laurie Cataneo, and they presently reside together with their two children, aged approximately 13 and 17 years. (*Id.* at 32, 346, 616.)

Plaintiff is a Vietnam War veteran. (*Id.* at 32, 68.) He served in the United States Navy as a diesel mechanic from November 3, 1965 to November 2, 1967. (*Id.* at 68, 347).  During his tour of duty, plaintiff performed river surveillance and interdiction. (*Id.* at 603.)  He was often part of a team that transported Navy Seals and Marine Reconnaissance teams to beachfronts, and stayed offshore to await their return. (*Id.* at 347.)  His team was frequently fired upon by enemy snipers, and was occasionally helicoptered out due to heavy enemy fire.

(*Id.*)  Plaintiff was honorably discharged following his two years of active service. (*Id.* at 603-04.)

Plaintiff does not have any lifelong friends. (*Id.* at 607.)  He does not attend social events, restaurants, or sporting events, and mostly stays home. (*Id.*)  He saw *2001: A Space Odyssey* in a movie theater shortly after his return from the Vietnam War, but left the theater early because he could not cope with the darkness and having other people around him. (*Id.* at 607-08.)

Although plaintiff has a history of cocaine and alcohol abuse, it appears that he has abstained for many years. (*Id.* at 346 (plaintiff stated in 2003 that he had not used alcohol or cocaine for ten years); *But see id.* at 611 (plaintiff testified in 2009 that he had not consumed alcohol for five or six years, and that he had not used drugs for ten years); *id.* at 309 (plaintiff indicated in 2004 that he had consumed alcohol within the past twelve months).)  Plaintiff has a driver's license and occasionally drives. (*Id.* at 209.)  He is capable of taking public transportation, but dislikes the experience due to the crowding, noise, and smell of diesel fumes, which remind him of the Vietnam War. (*Id.* at 608, 612.)  He does not take the subway unless his wife accompanies him. (*Id.* at 615.)

## II.  Work History

        After returning to the United States from the Vietnam
War, plaintiff worked in a supermarket for a short period of
time before joining the local police department, where his
tenure lasted only ten months. (Tr. at 604.)  In November 1968,
plaintiff joined the New York City Fire Department, where he
remained employed until October 17, 1990, plaintiff's alleged
disability onset date. (*Id*. at 46, 208, 604.)  Plaintiff
indicates that he was never late to work during his twenty-two
years of service. (*Id.* at 46, 212, 617.)

        In 1984, plaintiff was promoted from firefighter to
fire marshal. (*Id*. at 46, 605.)  As a fire marshal, plaintiff
was tasked with inspecting suspected arson scenes; this required
him to be in regular contact with burned bodies, which reminded
him of images from the Vietnam War. (*Id.* at 72, 605-06.)
Plaintiff testified that he was able to perform this task only
because his supervisor, Robert Mauro, protected him from dealing
with the public and allowed him to avoid particularly gruesome
scenes. (*Id.* at 606.)

        Although plaintiff worked alongside his colleagues for
many years, he did not socialize or develop any long-term
friendships. (*Id*. at 606-07.)  In fact, plaintiff routinely had
unprovoked verbal and physical confrontations with his coworkers
during his tenure as a fire marshal. (*Id.* at 606.)

10

In approximately 1978, plaintiff was suspended for two weeks due to a strike-related incident. (*Id*. at 618.)  Plaintiff committed two other infractions during his tenure with the Fire Department, but was not officially reprimanded for them.  First, the Fire Department learned that plaintiff had been arrested for "chasing some people with a gun," but did not terminate him, allegedly because of plaintiff's family connections. (*Id*. at 617.)  Second, plaintiff was involved in several fights, but was not reprimanded, allegedly because everyone in the firehouse, including officers, had been drinking alcohol at the time of the fights. (*Id.* at 618.)  Plaintiff did not provide specific dates for either of these incidents. (*See id.* at 617-18.)

Robert Mauro, plaintiff's supervisor from 1984 until 1990, submitted a letter to the SSA stating that plaintiff was often "angry, agitated, irritable, exasperated and violent for no apparent reason." (*Id*. at 31.)  Mr. Mauro indicated that plaintiff could not concentrate, follow simple directions, or deal with stressful situations, and that plaintiff often "suffer[ed] from what appeared to be panic attacks." (*Id.*)  Mr. Mauro also stated that because plaintiff confided that "he was having intrusive thoughts involving his experience in Viet Nam," Mr. Mauro made exceptions for plaintiff's behavior. (*Id.*)

Plaintiff testified that he retired from the Fire Department in October 1990 because he had severe anxiety, panic

11

attacks, and flashbacks, and because he feared jeopardizing the safety of his colleagues. (*Id.* at 72, 606.)  At the time of his retirement, plaintiff was thirty-third on a list of individuals in line for promotion to Supervising Fire Marshal. (*Id.* at 72.) That promotion would have entailed a substantial raise in salary. (*Id.*)

After his retirement from the Fire Department in October 1990, plaintiff worked for one or two months as a Park Ranger for the United States Department of the Interior. (*Id.* at 38, 604.)  He testified that certain interactions with the public caused him to overreact, and that he left the job before "something bad" happened. (*Id.* at 41, 621.)  For approximately two years thereafter, plaintiff informally and intermittently worked for a carpenter, mostly cleaning up debris. (*Id.* at 209-11.)  He earned approximately $200 per year for performing this service. (*Id.*)[2]

## III. PTSD-RELATED HISTORY AND MEDICAL EVIDENCE

### A. Plaintiff's Testimony

Plaintiff testified that his current PTSD symptoms include feeling hopeless, thinking that he is not going to live, severe nightmares, panic attacks, and difficulty sleeping. (*Id.* at 608-10.)

---

[2] The Commissioner found that the carpentry job was "clearly not substantial gainful activity," and that the Park Ranger position "constituted an unsuccessful work attempt." (Tr. at 211, 249.)

Plaintiff often dreams about being ambushed because he "got ambushed a lot" during the Vietnam War. (*Id.* at 137, 609.) In particular, he has a recurring dream about being unable to find his gun. (*Id.* at 609.) Plaintiff's nightmares, which he characterizes as sleeping "panic attacks," are so severe that he takes both Benadryl and Ambien to fall asleep. (*Id.*) Nevertheless, he often wakes up in the middle of the night, not knowing where he is, and feeling like he "need[s] to have oxygen or something there." (*Id.*)

Plaintiff currently suffers from panic attacks "almost everyday," which he says greatly disturb "the normal flow of a regular day." (*Id.* at 212.) Although group therapy has helped plaintiff "know that [he is] not going to die," he maintains that "when you're feeling it you still feel it."[3] (*Id.* at 610.)

In addition, for the past twenty-five to thirty years, plaintiff has woken up at night to "check the doors, check the windows, sit up for a little while, look around outside, [and] make sure the blinds are all closed . . . ." (*Id.* at 614.) He likens this habit to "standing guard duty" and maintaining a perimeter to "know that [I am] safe in there." (*Id.*) Plaintiff also sets an alarm for every two hours to make sure that he

---

[3] Plaintiff also noted that he suffered panic attacks almost daily between 1987 and 1990, and that he attempted to cope with the panic attacks at that time by drinking alcohol and using drugs. (Tr. at 610-11.)

wakes up because he "would [otherwise] feel that the house wasn't secure." (*Id*. at 613-14.)

Finally, plaintiff indicated that his symptoms worsened after the September 11, 2001 attacks because "it brought back what it feels like to lose friends and it brought back some guilt that [he] was still alive." (*Id*. at 611.)

**B. Laurie Cataneo's 2005 and 2010 Letters**

On January 5, 2005, plaintiff's wife, Laurie Cataneo, submitted a letter to the SSA regarding her husband's condition. (Tr. at 32-33.) Mrs. Cataneo indicated that she has known plaintiff since 1984, (*id*.), and further explained plaintiff "has no friends and is very isolated socially," spends his nights and days checking to make sure the house is secure, is "always looking thru [sic] the blinds out the window," and suffers from panic attacks regularly, which usually last approximately twenty minutes, (*id*. at 32).

Following ALJ Ettinger's May 7, 2009 decision, Mrs. Cataneo submitted another letter on February 5, 2010, regarding her recollection of plaintiff's condition during the Relevant Period. (*Id*. at 236.) Mrs. Cataneo recounted that in approximately 1996,[4] her first child's birthday and baptism had to be carefully structured around her husband's condition because, even with a group of twenty to twenty-five people,

---

[4](*See* Tr. at 32, indicating that eldest child was 10 years old in 2005, thereby placing the birthday party in the 1995-96 timeframe.)

there was a danger that plaintiff would "act out." (*Id.* at 236.)
Notwithstanding these preparations, however, plaintiff was
unable to attend the events. (*Id.*)  Mrs. Cataneo further
recalled that plaintiff was unable to attend her great-
grandmother-in-law's wake and funeral in 1994 and "would not
consider" a wake and funeral for his own parents. (*Id.*)
Finally, Mrs. Cataneo indicated that plaintiff's symptoms
worsened after the first World Trade Center terrorist attack in
1993. (*Id.*)

### C. Medical Evidence

Plaintiff was prescribed Valium in 1977 by the Staten
Island Medical Group, also known as the Health Insurance Plan of
Greater New York ("SIMG" or "HIP"). (*Id.* at 179, 214.)  Medical
records reflect, however, that plaintiff "cancelled" this
prescription on June 24, 1977, and plaintiff indicated that he
stopped taking Valium in approximately 1978. (*Id.* at 179, 215.)

In approximately 1981, plaintiff was seen by a
psychiatrist in Manhattan for approximately six to eight months.
(*Id.* at 216, 612.)  According to Dr. Stein, plaintiff's current
treating physician, plaintiff never shared his Vietnam War
experiences with this psychiatrist. (*Id.* at 163.)  Plaintiff was
also under the care of a psychologist while attending school in
approximately 1981-83; plaintiff indicates that this

15

psychologist attributed his panic attacks to the Vietnam War.
(*Id.* at 612.)

Plaintiff next sought treatment for his mental health
on May 30, 2002, at which time Dr. Deba Banerji of SIMG issued a
prescription for Lorazepam to treat plaintiff's anxiety. (*Id.* at
75.)  On February 13, 2003, plaintiff entered the emergency room
of the Veterans Affairs New York Harbor Healthcare System's
Brooklyn location ("VANYHHS"), complaining of nightmares,
extreme anxiety, and chest tightness. (*Id.* at 350-51.)
Plaintiff indicated that the symptoms were connected with the
September 11, 2001 attacks. (*Id.*)  The attending psychiatrist,
Dr. Sucmyun Moon, prescribed Prozac and Desyrel, and referred
plaintiff to the VANYHHS outpatient psychiatric clinic. (*Id.* at
351.)

Shortly thereafter, on February 27, 2003, plaintiff
was admitted to the psychiatric clinic. (*Id.* at 345.)  The
admitting diagnosis was PTSD. (*Id.*)  Plaintiff provided the
psychiatric clinic with a history of symptoms "varying in
intensity and frequency since returning from Vietnam." (*Id.*)
Plaintiff also indicated that he knew and worked with many of
the firemen that died on September 11. (*Id.* at 347.)  Barbara
Simmons, a Clinical Specialist in Adult Mental Health, assigned
plaintiff to a Vietnam War Veteran and Fireman counseling group

16

and referred plaintiff to Dr. Herbert Stein for an evaluation.
(*Id.* at 164, 347.)

On March 10, 2003, plaintiff visited Dr. Stein, a
board certified psychiatrist and director of the PTSD program at
the VANYHHS, for an initial consultation. (*Id.* at 164, 339.)
Plaintiff reported having nightmares about "being shot (was
ambushed in reality and felt unprepared), about being unable to
find his gun or bullets or his helmet . . . and about something
bad happening to his family." (*Id.* at 339.)  Plaintiff also
indicated that when "he returned from [Vietnam] he was angry,
and 'like a stick floating down a creek,' doing drugs and
drinking, smoking pot." (*Id.*)

In his progress notes, Dr. Stein summarized that
plaintiff was a 57-year-old war veteran with a "long history of
nightmares, social isolation, depression, [and] anxiety."[5] (*Id.*
at 341.)  Dr. Stein and Ms. Simmons agreed on a treatment plan

---

[5] Dr. Stein used the DSM-IV multi-axial scale to diagnose plaintiff. *See
Hernandez v. Astrue*, 814 F. Supp. 2d 168, 174 & n.7 (E.D.N.Y. 2011)
(describing diagnostic scale).  Under Axis I, which pertains to clinical
disorders, Dr. Stein diagnosed chronic PTSD, an anxiety disorder. (Tr. at
341.)  Dr. Stein found no relevant impairments under Axis II (personality
disorders and traits). (*Id.*)  Under Axis III (current medical conditions),
Dr. Stein referenced plaintiff's Bell's Palsy, IBS, and "pain behind his
ear." (*Id.* at 340, 342.)  Under Axis IV (current psychosocial stressors),
Dr. Stein diagnosed IBS, the death of plaintiff's mother, and "sequellae
[sic] 9/11." (*Id.* at 340.)  Finally, Dr. Stein diagnosed a Global Assessment
of Functioning ("GAF") score of 45 on Axis V. (*Id.* at 342; *see Stewart v.
Astrue*, No. 10-CV-3032, 2012 WL 314867, at *2 n.1 (E.D.N.Y. Feb. 1, 2012)
(indicating that GAF scores range from 1 to 100, and that "[t]he American
Psychiatric Association classifies a person having a GAF score of 41-50 as
having serious symptoms (*e.g.*, suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR any serious impairment in social,
occupational, or school functioning (*e.g.*, few friends, conflicts with peers
or co-workers)" (internal quotation marks omitted)).)

for plaintiff on March 20, 2003. (*Id.* at 337.)  They prescribed a mixture of medication and counseling to treat his symptoms. (*Id.*)

Plaintiff continued his treatment at the VANYHHS through at least February 2009. (*Id.* at 580.)  During that time, plaintiff participated in a number of counseling sessions with other firefighters and Vietnam War veterans. (*See, e.g.*, *id.* at 300, 332, 334.)  Plaintiff's symptoms continued to fluctuate in severity, and Dr. Stein administered varying doses of Klonopin, Trazodone, and Ambien to help plaintiff with his anxiety and sleep issues. (*Id.* at 320, 324, 330.)  Plaintiff's symptoms were particularly exacerbated in April 2004 by news coverage of the Iraq War. (*Id.* at 305, 307.)  In July 2004, after more than a year of treatment, plaintiff was still having panic attacks once per day and continued his "obsession ritual[]" of waking up constantly to check his doors and windows. (*Id.* at 376.)

**D. Dr. Stein's 2004, 2006, and 2010 Letters**

On December 9, 2004, Dr. Stein issued a letter, addressed "To Whom It May Concern," detailing plaintiff's condition at that time. (*Id.* at 163-64.)  It was co-signed by Ms. Simmons. (*Id.* at 164.)  Dr. Stein indicated that plaintiff actively isolates himself from his family "to avoid problems," and that plaintiff's "first marriage ended due to the behaviors

18

he demonstrated in order to cope with what he was experiencing."
(*Id.* at 163.)

Dr. Stein further opined that being a firefighter
allowed plaintiff "to hide and socially distance" himself from
his family. (*Id.*)  Plaintiff was able to function as a
firefighter despite his condition because of "the support of
comrades who would cover for him when he was having
difficulties." (*Id.*)  During plaintiff's last few years with the
Fire Department, however, when plaintiff worked as a fire
marshal, "every time he had to go on an assignment he [sic] was
like being back in Vietnam." (*Id.*)  Eventually, plaintiff's
"symptoms became so overwhelming" that he retired for fear of
being labeled "crazy." (*Id.*)  Dr. Stein notes that, at that
time, plaintiff could have sought and potentially obtained a
medical retirement, which would have made plaintiff "eligible
for social security disability benefits." (*Id.*)

Additionally, Dr. Stein found that plaintiff
experienced an "exacerbation of symptoms" following the
September 11 attacks. (*Id.* at 164.)  By approximately 2002,
plaintiff "learned that it was acceptable to talk about how the
experience was affecting him," and he consequently entered the
PTSD treatment program at the VANYHHS. (*Id.*)  Finally, Dr. Stein
noted that plaintiff "ha[d] been advised to put in a claim for
social security disability benefits even though his retirement

19

was premature and not based on his mental state at the time."
(*Id.*)

Dr. Stein issued a second letter, this time addressed
to the SSA, on January 20, 2006. (*Id.* at 162.)  It was also co-
signed by Ms. Simmons. (*Id.*)  In the 2006 letter, Dr. Stein
indicated that it was the opinion of plaintiff's treatment team
that plaintiff had been suffering from PTSD "since his Vietnam
combat experiences in 1966." (*Id.*)  Furthermore, Dr. Stein
opined that plaintiff was initially able to conceal his
emotional trauma because the Fire Department "mimicked a
paramilitary organization," and that plaintiff's early
retirement was directly correlated with the "breakdown of his
defenses" that he had previously "used to avoid dealing with
emotional pain." (*Id.*)

On January 20, 2010, Dr. Stein issued another letter
directly responding to ALJ Ettinger's May 2009 decision.[6] (*Id.* at
228-29.)  The January 2010 letter offered Dr. Stein's
retrospective opinion on "the severity of [plaintiff's]
psychiatric impairment as of December 1995." (*Id.* at 228.)  This
opinion was based on Dr. Stein's post-2002 clinical treatment of
plaintiff and Dr. Stein's general professional knowledge and
experience. (*Id.*)  In it, Dr. Stein opined, to a "reasonable

---

[6] As discussed above, ALJ Ettinger's decision held that, during the Relevant
Period, plaintiff retained the RFC to perform certain types of jobs
prevalent in the national economy and was therefore not disabled at that
time.

degree of medical certainty," that plaintiff's PTSD was as severe in December 1995 as it was in March 2002, when plaintiff first presented himself for treatment at the VANYHHS. (*Id.* at 229.)  Indeed, Dr. Stein stated that plaintiff's "condition was likely worse in 1995 in light of the absence of treatment." (*Id.*)

Dr. Stein's determination was based on the fact that: (i) plaintiff's drinking and drug use "reflect[] the misguided belief that one can manage their symptoms on their own," especially because the effects of drugs and alcohol are particularly attractive to individuals with chronic mood disorders; (ii) plaintiff's departure from the Fire Department was due in part to a "deep seated fear that his symptoms were spiraling out of control"; (iii) plaintiff's intermittent use of Valium had little effect on his symptoms because he never opened up about his Vietnam experiences; (iv) plaintiff's minimal response to many years of active treatment strongly supports the inference that his condition was "as severe in 1995 as it is now"; (v) although plaintiff's symptoms were exacerbated by the September 11 attacks, his underlying condition, and its overall severity, is related to his Vietnam War experiences; and (vi) "the course of [plaintiff's] disorder is not unusual based on our experiences." (*Id.*)

Dr. Stein attached a completed "Questionnaire for Psychiatric Disorders" to the 2010 letter. (*Id.* at 230-34.) The completed questionnaire indicates that plaintiff has "marked" limitations in the categories of "maintaining social functioning" and "[d]eficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner," and that plaintiff has "[c]ontinuously experienced" episodes of "decompensation." (*Id.* at 232-33.) The questionnaire does not provide dates for when these limitations reached their current level of severity.[7]

## DISCUSSION

### I. Standard of Review

A district court reviewing the Commissioner's decision to deny disability benefits must "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (*citing Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

---

[7] The questionnaire also appears to indicate that plaintiff's first contact with Dr. Stein was in March 1992 (Tr. at 230), rather than March 2003 (*id.* at 339), but this is most likely an error as this contact date appears nowhere else in the record. Nor do the parties discuss the March 1992 date.

22

After reviewing the Commissioner's determination, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." *Butts*, 388 F.3d at 384 (*quoting* 42 U.S.C. § 405(g)).  "Remand for further development of the evidence is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Kirkland v. Astrue*, No. 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (citing cases).  Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles," even if the Commissioner's decision is arguably supported by substantial evidence, the court cannot affirm the Commissioner's decision unless application of the correct legal standards could only lead to the Commissioner's holding. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

## II. Determining Disability Through the Five-Step Evaluation

In order to receive disability benefits, a claimant must become disabled while he still meets the insured status requirements of the Social Security Act and the regulations promulgated by the SSA. *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically

23

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a "five-step sequential evaluation" to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (describing five-step process).  If the Commissioner can determine that a claimant is disabled or not disabled at any step of the five-step sequence, the evaluation stops at that step and the Commissioner issues his decision; if a determination cannot be made at steps 1 through 4, the sequence continues to the next step. 20 C.F.R. § 404.1520(a)(4).

At step 1, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is engaged in substantial gainful employment, he is not disabled "regardless of [his] medical condition." 20 C.F.R. § 404.1520(b). Otherwise, the Commissioner moves to step 2, and determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). When the claimant purports to have a mental impairment, the Commissioner must apply a "special technique" to determine the severity of that mental impairment (*i.e.*, the technique must be applied within the context of step 2). 20 C.F.R. § 404.1520a;

24

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (describing analysis).[8]

If the claimant's impairment is in fact medically severe, the sequence continues to step 3, in which the Commissioner compares the claimant's impairment to a listing of impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairment "meets or equals" one of the listed impairments, he is *per se* disabled irrespective of his "age, education, and work experience," and the sequential evaluation stops. 20 C.F.R. § 404.1520(d).

If the claimant is not *per se* disabled under step 3, the Commissioner must determine the claimant's residual functional capacity ("RFC") before continuing to step 4. 20 C.F.R. § 404.1520(e).  RFC is defined as the most the claimant can do in a work setting despite the limitations imposed by his impairment. 20 C.F.R. 404.1545(a)(1).  In determining the

---

[8] First, the Commissioner determines whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1).  Second, the Commissioner must rate the degree of functional limitation caused by this impairment in four broad "functional areas": (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).  For the first three areas, the Commissioner uses a five-point scale ("[n]one, mild, moderate, marked, and extreme"); for the fourth area, the Commissioner uses a four-point scale ("[n]one, one or two, three, four or more"). 20 C.F.R. § 404.1520a(c)(4).  Generally, a finding of "mild" limitation or less in the first three areas, combined with a finding of "none" in the fourth area, means that the claimant does not have a medically severe mental impairment. 20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the mental impairment is severe, the sequential evaluation moves to step three, as described *infra*.

claimant's RFC, the Commissioner should consider "all of the relevant medical evidence," as well as descriptions and observations by non-medical sources, such as the claimant's friends and family. 20 C.F.R. 404.1545(a)(3).

To the extent that the Commissioner's RFC determination relies on plaintiff's own statements with respect to his symptoms, or statements from other, non-medical witnesses, the Commissioner is obliged to follow a two-step process for determining the credibility of those statements. 20 C.F.R. § 416.929(c)(3); SSR 96-7p, 1996 SSR LEXIS 4.

> First, "the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's . . . symptoms . . . ." Second, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . ."

*Morrison v. Astrue*, No. 08-CV-2048, 2010 U.S. Dist. LEXIS 115190, at *11 (E.D.N.Y. Oct. 27, 2010) (alterations in original) (footnote and citation omitted).[9]

---

[9] Moreover, the Commissioner's determination that a witness's description of a claimant's symptoms is not credible: (i) must be set forth with sufficient specificity to permit a reviewing court to decide whether that determination was supported by substantial evidence, *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); and (ii) should explain the weight afforded to that statement in the Commissioner's ultimate decision, *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004).

After making his RFC determination, the Commissioner will proceed to step 4, at which point the Commissioner must determine whether the claimant's RFC is sufficient to perform his "past relevant work," which is defined as substantial gainful activity that the claimant has done within the past fifteen years. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b)(1).  If the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f).  Otherwise, the Commissioner must determine at step 5 whether the claimant can make "an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v).

In making his determination under step 5, the Commissioner must use his prior RFC finding in conjunction with the claimant's "vocational factors" (*i.e.*, age, education, and work experience) to determine whether the claimant can transition to another job that is prevalent in the national economy. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c)(1).  The Commissioner has a limited burden under step 5 to provide "evidence that demonstrates that other work exists in significant numbers in the national economy that" the claimant can do in light of his RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2).  If the claimant cannot transition to another job prevalent in the national economy, the Commissioner must find the claimant disabled. *See* 20 C.F.R. § 404.1520(g)(1).

27

## A. ALJ Ettinger's Application of the Five-Step Evaluation

On May 7, 2009, ALJ Ettinger issued an "unfavorable" decision finding that plaintiff was not disabled during the Relevant Period (*i.e.*, between October 17, 1990 and December 31, 1995). (Tr. at 246-56.)  ALJ Ettinger's decision superseded a prior decision by ALJ Crispino, who found plaintiff disabled as of January 11, 2005. (*Id.* at 14-20.)[10]  ALJ Ettinger's decision became the final decision of the Commissioner on April 1, 2011, when the Appeals Council denied review of ALJ Ettinger's decision. (*Id.* at 221.)

To determine whether plaintiff was disabled during the Relevant Period, ALJ Ettinger applied the five-step sequential evaluation described above.  Under step 1, ALJ Ettinger determined that plaintiff had not engaged in significant gainful employment since the start of the Relevant Period (October 17, 1990), when plaintiff left his position at the Fire Department. (*Id.* at 249.)  ALJ Ettinger then proceeded to steps 2 and 3, where he applied the four-step analysis for determining the severity of mental impairments. (*Id.* at 249-50.)  In sum, ALJ Ettinger determined that although plaintiff had a severe

---

[10] Although the Appeals Council vacated ALJ Crispino's decision, it instructed ALJ Ettinger to restrict his findings to the Relevant Period, which ends on December 31, 1995. (Tr. at 260-61.)  ALJ Ettinger was therefore not permitted to opine on whether plaintiff became disabled at some point after the Relevant Period.  At the March 2009 hearing, however, ALJ Ettinger stated that he saw no reason to question ALJ Crispino's prior determination that plaintiff was disabled as of January 11, 2005. (*Id.* at 600.)  As a result, ALJ Crispino's finding that plaintiff was disabled as of at least January 11, 2005 still stands, a point which both parties appear to accept.

medically determinable impairment (PTSD) during the Relevant Period, plaintiff's impairment was not medically equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I, and plaintiff was thereby not *per se* disabled under step 3. (Tr. at 250.)

In determining that plaintiff had a severe impairment during the Relevant Period, ALJ Ettinger disregarded the expert testimony of Dr. Jusino,[11] who indicated that the record does not "permit a reasonable inference that [plaintiff] had a medically determinable impairment" during the Relevant Period. (*Id.* at 252.)  Instead, ALJ Ettinger relied on the retrospective diagnosis of Dr. Stein, plaintiff's treating physician, in concluding that plaintiff had PTSD during the Relevant Period and that plaintiff's PTSD constituted a severe impairment during that time. (*Id.*)

After determining that plaintiff was not *per se* disabled under step 3, ALJ Ettinger proceeded to assess plaintiff's RFC.  ALJ Ettinger found that, due to plaintiff's PTSD, plaintiff's capacity to work was limited during the Relevant Period by his inability to "tolerate more than occasional interaction with others or exposure to trauma victims." (*Id.* at 252.)

---

[11] As explained *infra*, ALJ Ettinger called upon Dr. Jusino to determine whether one could reasonably infer from the record that plaintiff had PTSD during the Relevant Period.

In making his RFC determination, ALJ Ettinger considered, but discredited, the testimony of plaintiff, Mrs. Cataneo (plaintiff's wife), and Mr. Mauro (plaintiff's former supervisor at the Fire Department) with respect to plaintiff's symptoms during the Relevant Period. (*Id.* at 252-53.)  ALJ Ettinger acknowledged that if plaintiff's supporting testimony were "fully credited," it "would result in a far more restrictive residual functional capacity finding." (*Id.* at 252.)  Nevertheless, ALJ Ettinger determined that neither plaintiff's own testimony, nor the corroborating testimony of his wife and former supervisor, could be completely credited. (*Id.* at 252—53.)

First, ALJ Ettinger questioned Mrs. Cataneo's and Mr. Mauro's ability to accurately describe plaintiff's condition as it existed "more than 14 years ago." (*Id.* at 253.)  ALJ Ettinger also found that Mrs. Cataneo's testimony was suspect because she stood to receive an "indirect financial benefit" from plaintiff's receipt of disability benefits. (*Id.*)  Second, ALJ Ettinger found that Mr. Mauro was a friend of plaintiff and was willing to write a letter at plaintiff's behest despite the fact that they last worked together more than thirteen years ago, suggesting that Mr. Mauro was not an impartial witness. (*Id.*)

ALJ Ettinger also provided three bases for discrediting plaintiff's own testimony with respect to his

symptoms during the Relevant Period: first, the unlikelihood
that a person with "extreme behavioral problems," which
plaintiff purports to have, would be able to work for twenty-two
years at the Fire Department, (*id.* at 253); second, the fact
that plaintiff did not apply for disability benefits when he
left his position at the Fire Department, (*id.*); and third, most
significantly, the fact that plaintiff failed to seek
professional treatment for his mental impairment between October
17, 1990 (plaintiff's alleged disability onset date) and March
27, 2002, (*id.* at 254).

      Finally, ALJ Ettinger found that although Dr. Stein's
medical opinion indicated that plaintiff had PTSD during the
Relevant Period and that plaintiff was unable to continue
working as a fire marshal due to PTSD, Dr. Stein did not opine
that plaintiff "was incapable of performing other jobs." (*Id.*)
ALJ Ettinger also noted that Dr. Stein himself stated that
plaintiff's condition was exacerbated by the September 11, 2001
attacks, thus indicating that plaintiff's condition was not as
severe during the Relevant Period as it was when plaintiff
started treatment in May 2002 (*i.e.*, approximately seven months
after the September 11, 2001 attacks). (*Id.*)

      ALJ Ettinger then proceeded to steps 4 and 5 of the
sequential evaluation.  At step 4, he determined that, due to
plaintiff's inability to tolerate more than occasional

interpersonal interaction, plaintiff was unable to perform his

past relevant work as either a firefighter or fire marshal

because both positions required "exceptional interpersonal

skills." (*Id.*)

At step 5, ALJ Ettinger considered the expert

testimony of Ms. Fass-Karlin, who determined that, during the

Relevant Period, a significant number of jobs existed in the

national economy that could be performed by an individual with

plaintiff's RFC and vocational profile (45 years old, two years

of higher education, and experience with highly skilled work).

(*Id.* at 255.)  All of these jobs required "the least amount of

social interaction" of any jobs prevalent in the national

economy. (*Id.*)  As a result, ALJ Ettinger determined that

plaintiff had sufficient RFC during the Relevant Period to

perform a number of jobs prevalent in the national economy and

that plaintiff was thus not disabled at that time. (*Id.* at 256.)

**B. Uncontroverted Issues and the Parties' Contentions**

Both parties agree that plaintiff has not engaged in

significant gainful employment since October 1990 and that

plaintiff's PTSD constituted a severe impairment during the

Relevant Period. (*See* Def. Mem. at 23; Pl. Mem. at 35-36.)  The

Commissioner adopts ALJ Ettinger's determination under step 3

that during the Relevant Period plaintiff's PTSD did not meet or

medically equal one of the listed impairments in 20 C.F.R. Part

32

404, Subpart P, Appendix I, and plaintiff does not appear to seriously challenge this determination. (*See* Def. Mem. at 24-25.)

In addition, both parties implicitly agree that Social Security Ruling 83-20, which provides guidelines for determining the onset date of mental disabilities (*see infra*), is applicable to the instant action.[12]  Disability onset date is defined as the first day that a claimant is disabled as prescribed by the Social Security Act and regulations promulgated by the SSA, in other words, pursuant to the five-step sequential evaluation. SSR 83-20, 1983 SSR LEXIS 25.  Because both parties agree that SSR 83-20 is applicable, and because SSR 83-20 deals exclusively with determining the onset date of mental and other non-traumatic disabilities, the essential issue presented before this court is whether ALJ Ettinger correctly determined the onset date of disability due to plaintiff's PTSD.[13]

Plaintiff argues that ALJ Ettinger failed to follow the procedures set forth in SSR 83-20 when determining

---

[12] Plaintiff's opening memorandum focuses almost exclusively on ALJ Ettinger's purported failure to follow SSR 83-20, while the Commissioner's reply brief attacks the merits of plaintiff's SSR 83-20 contentions and does not argue that SSR 83-20 is inapplicable to this case. (*See* Def. Reply at 1-6; Pl. Mem. at 33-39.)

[13] Furthermore, since a determination of onset date is only necessary when a claimant has been found disabled at some other, future date, it seems that both parties implicitly agree that plaintiff was disabled due to PTSD as of January 11, 2005 (*i.e.*, the disability onset date set by ALJ Crispino), or, at the very least, at some point after the Relevant Period – although the parties disagree on whether plaintiff's PTSD was similarly disabling during the Relevant Period. *See* SSR 83-20, 1983 SSR LEXIS 25 ("In addition to determining that an individual is disabled, the decisionmaker [sic] must also establish the onset date of disability.").

plaintiff's RFC because ALJ Ettinger improperly discredited the
lay testimony of plaintiff, Mrs. Cataneo, and Mr. Mauro, (Pl.
Mem. at 38-39); ALJ Ettinger improperly predicated his rejection
of plaintiff's alleged onset date on plaintiff's lack of
clinical treatment during the Relevant Period, (*id.* at 36-37);
and ALJ Ettinger did "not discharge his duty under SSR 83-20 by
calling on the testimony of a medical expert who is not willing
to make a medical inference" with respect to plaintiff's
condition during the Relevant Period, (Pl. Reply at 3 (referring
to Dr. Jusino's expert testimony)).

   In response, the Commissioner argues that ALJ Ettinger
properly relied on circumstantial evidence in the administrative
record to discredit plaintiff's supporting lay testimony, (Def.
Reply at 4-5), and that because the Second Circuit has held that
failure to seek treatment "seriously undermines" a claimant's
disability claim, ALJ Ettinger properly considered plaintiff's
lack of treatment in rejecting plaintiff's alleged onset date,
(*id.* at 5-6).

   In addition, with respect to plaintiff's third
argument (*i.e.*, that calling Dr. Jusino did not discharge ALJ
Ettinger's duty under SSR 83-20), the Commissioner argues that
SSR 83-20 requires the ALJ to call upon a medical advisor where,
as here, the mental impairment existed before the first recorded
medical examination and the disability onset date must therefore

be inferred from contemporaneous circumstantial evidence and retrospective medical assessments. (*Id.* at 3.)  The Commissioner then points to SSR 83-20's requirement that an informed determination on a claimant's past medical condition "must have a legitimate medical basis." SSR 83-20, 1983 SSR LEXIS 25.  In the Commissioner's view, Dr. Jusino properly considered the record and opined that the record did not permit a reasonable inference that plaintiff had a medically determinable impairment during the Relevant Period. (Def. Reply at 3.)  As such, the Commissioner argues that ALJ Ettinger discharged his obligation under SSR 83-20 by receiving Dr. Jusino's testimony, regardless of whether ALJ Ettinger fully credited that testimony. (*Id.*)

SSR 83-20, however, imposes an obligation on the Commissioner to both seek and use the advice of a medical expert in order to determine the onset date of disability due to a mental impairment when there is no contemporaneous medical evidence from the period around the alleged onset date and the record is found to be ambiguous or contradictory with respect to onset date. *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-278, 2012 WL 1067660, at *13 (E.D.N.Y. Mar. 29, 2012).  The failure to follow SSR 83-20 constitutes grounds for remand when the Commissioner's decision is not otherwise supported by substantial evidence. *Morrison*, 2010 U.S. Dist. LEXIS 115190, at *19.  Because ALJ Ettinger did not comply with SSR 83-20 and

35

because his determination that plaintiff was not disabled during the Relevant Period is not otherwise supported by substantial evidence, remand for further administrative proceedings is appropriate.[14]

## III. DETERMINATION OF DISABILITY ONSET DATE

### A. Requirements Imposed by SSR 83-20

SSR 83-20 establishes guidelines for determining the onset date of disabling impairments with non-traumatic origins, including mental impairments. 1983 SSR LEXIS 25.  SSR 83-20 is triggered when the Commissioner determines that a claimant is *presently* disabled, but must also determine whether that claimant was likewise disabled at some point in the past.  In essence, this past date is the "onset date" of that claimant's present disability.

The onset date is formally defined as "the first day an individual is disabled as defined in the Act and the regulations." *Id*.  As described above, a claimant's Social

---

[14] Remand on these grounds obviates the need to decide a number of other issues raised by the parties.  First, as discussed below, Dr. Stein's 2010 letter is now part of the administrative record.  To the extent that the ALJ on remand finds any remaining ambiguity in the record with respect to plaintiff's disability onset date, the ALJ will be obligated to supplement the record with additional testimony from Dr. Stein.  Thus, it is unnecessary to rule on ALJ Ettinger's credibility determinations because the credibility determinations made by the ALJ on remand will be supported by additional medical evidence and may be materially different from ALJ Ettinger's current determinations.  Second, it is unnecessary to determine whether the Appeals Council improperly failed to reconsider ALJ Ettinger's decision in light of Dr. Stein's 2010 letter because the case will be remanded for further administrative proceedings and the 2010 letter is part of the administrative record that will be considered by the ALJ on remand.

Security disability status is determined via the five-step
sequential evaluation. 20 C.F.R. § 404.1520.  Thus, determining
a claimant's disability onset date utilizes the same sequential
analysis as determining whether that claimant was disabled
pursuant to the five-step evaluation at some relevant point in
the past.  As a result, SSR 83-20 logically applies to the
entirety of the five-step sequential evaluation, including the
Commissioner's determination of RFC.

### 1. The Disability Onset Date Cannot be Arbitrary

The disability onset date ultimately chosen by the
Commissioner "must be . . . based on the facts and can never be
inconsistent with the medical evidence of record." SSR 83-20,
1983 SSR LEXIS 25.  Moreover, when there is no objective medical
evidence from the period surrounding a claimant's alleged onset
date, the disability onset date chosen by the Commissioner must
be the product of an "informed judgment" with a "legitimate
medical basis." *Id.*

An arbitrary onset date determination by the
Commissioner will not be accepted by a reviewing court:

> [C]ourts have held tha[t] an ALJ may not
> rely on the first date of diagnosis as the
> onset date simply because an earlier
> diagnosis date is unavailable.  Similar
> results obtain where an ALJ adopts some
> other equally arbitrary onset date, such as
> the date on which the claimant applied for
> SSI benefits, received a consultative

37

> examination, or appeared before an ALJ at an
> administrative hearing.

*McCall v. Astrue*, No. 05-CV-2042, 2008 U.S. Dist. LEXIS 104067,

at *65 (S.D.N.Y. Dec. 23, 2008) (citations and footnote

omitted).

## 2. Evidentiary Guidelines for Determining Onset Date

SSR 83-20 delineates three categories of evidence that

should be considered by the Commissioner in determining a

claimant's disability onset date.  First, "the starting point in

determining the [onset date] is the individual's statement as to

when disability began." 1983 SSR LEXIS 25.  The claimant's

alleged onset date should be adopted by the Commissioner as long

as it is consistent with all of the available evidence. *McCall*,

2008 U.S. Dist. LEXIS 104067, at *82.  Second, the "day the

impairment caused the individual to stop work is frequently of

great significance" in determining an onset date. 1983 SSR LEXIS

25.  Third, "medical evidence serves as the primary element in

the onset determination." *Id*.  In reviewing this third category

of evidence, the Commissioner is obliged to obtain relevant

reports from all medical sources, including physicians,

hospitals, and government agencies. *Id.*  Furthermore, in the

case of slowly progressive impairments, where the alleged onset

date is frequently in the distant past, the Commissioner must

infer the claimant's onset date from "medical and other evidence

38

that describe the history and symptomatology of the disease process." *Id.*

### 3. Additional Guidelines for Claimants Without Contemporaneous Medical Evidence; Requirement to Call Upon a Medical Advisor

Apart from the three categorical evidentiary guidelines described above, SSR 83-20 imposes additional requirements when a claimant is unable to present objective medical evidence from the period surrounding his alleged onset date. *Id.*

The Commissioner can use current medical evidence to infer that a claimant's present disability was similarly disabling even before the claimant's first medical consultation or treatment for his disabling condition. *Id.* The determination of whether a claimant's present disability was in fact disabling at some point in the past ultimately depends on the "informed judgment" of the Commissioner. *Id.* Nevertheless, this judgment must have a "legitimate medical basis," and SSR 83-20 unambiguously states that "the [ALJ] *should call on the services of a medical advisor when onset must be inferred.*" *Id.* (emphasis added).

Indeed, courts have found it "essential" for the Commissioner to consult a medical advisor where, as here, a claimant does not have contemporaneous medical evidence from the period around his alleged disability onset date; the record is

ambiguous with respect to onset date; and claimant's disability onset date must therefore be inferred from present medical evidence. *Stokes*, 2012 WL 1067660, at *13; *see also Caputo v. Astrue*, No. 07-CV-3992, 2010 U.S. Dist. LEXIS 103089, at *16-17 (E.D.N.Y. Sept. 29, 2010) ("'While SSR 83-20 . . . does not mandate that a medical advisor be called in every case, courts have construed this step to be essential when the record is ambiguous regarding onset date.'" (quoting *Parmenter v. Astrue*, No. 08-CV-1132, 2010 WL 2884866, at *5 (N.D.N.Y Apr. 23, 2010), *adopted by*, 2010 WL 2803418 (N.D.N.Y. July 15, 2010))); *Martinez v. Barnhart,* 262 F. Supp. 2d 40, 45 (W.D.N.Y. 2003) (holding that, in the absence of contemporaneous medical evidence, ALJ should have appointed a medical advisor to aid in making an inference "from the record as a whole" with respect to claimant's onset date).

### 4. The Commissioner's Failure to Comply With SSR 83-20 Warrants Remand If His Determination of Disability Onset Date Is Not Otherwise Supported by Substantial Evidence

The Commissioner's failure to adhere to the guidelines set forth in SSR 83-20 when determining a claimant's disability onset date constitutes grounds for remand when the Commissioner's determination of disability onset date is not otherwise supported by substantial evidence. *Morrison*, 2010 U.S. Dist. LEXIS 115190, at *19; *cf. Monette v. Astrue,* 269 F. App'x

40

109, 112-113 (2d Cir. 2008) (affirming despite Commissioner's
failure to follow SSR 83-20 because objective medical evidence
from the time period surrounding claimant's alleged disability
onset date supported Commissioner's RFC determination).[15]

In addition, a claimant is entitled to remand when the
Commissioner fails to adhere to SSR 83-20 and the disability
onset date is not supported by substantial evidence, even when a
claimant is unable to produce medical evidence from the period
around the alleged disability onset date. *Manago v. Barnhart*,
321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004); *Martinez,* 262 F. Supp.
2d at 45-50 (remanding solely for calculation of benefits due to
Commissioner's failure to follow SSR 83-20, notwithstanding
claimant's inability to produce any medical records showing that
he suffered from PTSD around his alleged onset date).

---

[15] Remand is equally appropriate where the Commissioner's violation of SSR 83-20 is based on his failure to call upon a medical advisor to help determine a claimant's disability onset date. *See Gibson v. Astrue*, No. 07-CV-2845, 2009 U.S. Dist. LEXIS 37071, at *7 (S.D.N.Y. Apr. 30, 2009) (remanding case with instructions for ALJ to call upon medical advisor); *Felicie v. Apfel*, No. 95-CV-2832, 1998 U.S. Dist. LEXIS 5068, at *11-12, *19 (remanding for further proceedings in part because ALJ failed to call upon medical advisor when determining onset date became a matter of "guesswork"); *Walton v. Halter*, 243 F.3d 703, 709-10 (3d Cir. 2001) (requiring ALJ to call upon a medical expert to determine the onset date of a mental disability in the absence of contemporaneous evidence because that judgment must have a "medical basis") (citing other Circuits).

**B. ALJ Ettinger Failed to Follow SSR 83-20 When He Called a Medical Expert but Failed to Consider That Expert's Testimony in Determining Plaintiff's Disability Onset Date**

    **1. SSR 83-20 Required ALJ Ettinger to Call a Medical Advisor to Help Determine Plaintiff's Disability Onset Date**

In the instant action, there is no objective medical evidence from the Relevant Period with respect to plaintiff's PTSD. (Tr. at 252.)  Pursuant to SSR 83-20, ALJ Ettinger was therefore required to utilize a medical advisor to assist with determining the onset date of plaintiff's disability due to PTSD.  The parties agree that plaintiff's PTSD was a severe impairment during the Relevant Period, but do not agree that the PTSD was *per se* disabling under step 3 of the sequential evaluation.  Therefore, the court begins its review of ALJ Ettinger's compliance with SSR 83-20 by examining ALJ Ettinger's determination of plaintiff's RFC during the Relevant Period.  At this stage of the sequential evaluation between steps 3 and 4, ALJ Ettinger considered the testimony of plaintiff's wife and former supervisor, noting that, if credited, such testimony would "result in a far more restrictive" RFC. (*Id.* at 252-53.)  ALJ Ettinger also found, however, that this testimony was inconsistent with plaintiff's work history and lack of treatment during the Relevant Period, and he did not credit the testimony. (*Id.*)

Put another way, ALJ Ettinger determined that the record lacked objective contemporaneous medical evidence and that the non-medical evidence was ambiguous, not credible, and contradictory with respect to disability onset date. Consequently, pursuant to SSR 83-20, ALJ Ettinger was obligated to seek the advice of a medical expert to help determine the date of disability onset. *See, e.g.*, *Stokes*, 2012 WL 1067660, at *13 (holding that, due to limited medical evidence and a conflict between claimant's alleged onset date and other circumstantial evidence, the ALJ on remand was obligated to consult a medical expert to determine onset date); *Felicie*, 1998 U.S. Dist. LEXIS 5068, at *11-12 (finding that, because the record was "limited" with respect to contemporaneous evidence, ALJ was obligated by SSR 83-20 to call upon a medical advisor to help determine claimant's disability onset date).

### 2. Receiving Dr. Jusino's Testimony Did Not Discharge ALJ Ettinger's Duty to Call a Medical Advisor

Although ALJ Ettinger received expert testimony from Dr. Carlos Jusino during the March 17, 2009 administrative hearing, (Tr. at 623-29), ALJ Ettinger failed to discharge his duty under SSR 83-20 to obtain the advice of a medical expert because he did not rely on the expert testimony he received from Dr. Jusino to determine plaintiff's disability onset date.  At the March 2009 hearing, ALJ Ettinger asked Dr. Jusino whether

the medical evidence in the administrative record permitted "a reasonable inference as to whether or not [plaintiff] had a medically determinable mental impairment during [the Relevant Period]." (Tr. at 624.)  Dr. Jusino responded with "No, Your Honor." (*Id.*)  Dr. Jusino based this determination on several factors including the implausibility that plaintiff would abstain from professional treatment for twelve years if he "had a significant mental impairment," (*id.*); plaintiff's use of drugs and alcohol during the Relevant Period, because withdrawal symptoms from these substances mimic panic disorders, (*id.* at 625-26); and the fact that Dr. Stein's diagnosis required more "clarification" before it could be used to infer that plaintiff had PTSD during the Relevant Period, (*id.* at 625).

Notwithstanding Dr. Jusino's testimony, in issuing his decision, ALJ Ettinger accepted, in part, the medical opinion of Dr. Stein, plaintiff's treating physician, who stated that plaintiff had PTSD during the Relevant Period. (*Id.* at 252.) Indeed, ALJ Ettinger's decision only mentioned Dr. Jusino's testimony once — to reject it.  Thus, although ALJ Ettinger received and rejected testimony from a medical advisor, he did not use that medical advisor's testimony to help him determine plaintiff's disability onset date or to clarify the ambiguous record regarding plaintiff's disability onset date, thus violating the spirit and underlying purpose of SSR 83-20. *See,*

44

*e.g.*, *Stokes*, 2012 WL 1067660, at *13 (holding that calling upon a medical advisor is "essential when the record is ambiguous regarding onset date" (internal quotation marks omitted)); *Morrison*, 2010 U.S. Dist. LEXIS 115190 at *18; *Felicie*, 1998 U.S. Dist. LEXIS 5068, at *10 ("[T]he ALJ should call on the services of a medical advisor *to help* in making the necessary inferences." (emphasis added) (internal quotation marks omitted)).

Furthermore, because SSR 83-20 "'imposes what might fairly be called heightened record-development duties'" on the Commissioner, ALJ Ettinger should have clearly articulated why he rejected Dr. Jusino's expert testimony, and particularly accepted Dr. Stein's finding that plaintiff suffered from PTSD during the relevant period since October 17, 1990. *Stokes*, 2012 WL 1067660, at *13.

In light of the foregoing, the court has "a reasonable basis [to] doubt whether the ALJ applied correct legal principles" in determining plaintiff's disability onset date. *Johnson*, 817 F.2d at 986.

## C. The Commissioner's Finding that Plaintiff Was Not Disabled During the Relevant Period is Not Supported by Substantial Evidence

The Commissioner's failure to adhere to the guidelines set forth in SSR 83-20 warrants remand when his determination is

not otherwise supported by substantial evidence. *Morrison,* 2010
U.S. Dist. LEXIS 115190, at *19.

As ALJ Ettinger acknowledged, there is no affirmative
evidence of either disability or non-disability from the
Relevant Period; there are no medical records, and any work
history was brief and inconsequential. (Tr. at 249, 252.)
Nevertheless, ALJ Ettinger inferred, from the following
evidence, that plaintiff's PTSD was not sufficiently limiting
during the Relevant Period to be disabling: (i) plaintiff worked
for twenty-two years, was eventually promoted to fire marshal,
and was in line for another promotion at the time of his
retirement, (*id.* at 253); (ii) plaintiff did not apply for
disability benefits at the time of his retirement, (*id.*); and
(iii) most significantly, plaintiff did not seek treatment until
2002, (*id.* at 254).

These inferences do not constitute substantial
evidence supporting ALJ Ettinger's conclusion that plaintiff was
not disabled during the Relevant Period, however, because
inferences of this type have routinely been rejected by courts
within the Second Circuit and because Dr. Stein's 2010 letter,
which is part of the administrative record on review, appears to
indicate that plaintiff's PTSD was disabling during the Relevant
Period.

46

1. **The Type of Evidentiary Inferences Made by ALJ Ettinger Have Been Routinely Rejected by Courts in the Second Circuit**

ALJ Ettinger inferred that plaintiff's PTSD was not as severe during the Relevant Period as plaintiff claims because of his twenty-two years of work experience.  As Chief Judge Amon held in *Morrison*, however, "the fact that [a claimant] was able to work during a period preceding his claimed onset of disability . . . does not imply that his symptoms could not have subsequently worsened to the point that they became disabling." 2010 U.S. Dist. LEXIS 115190, at *13.

The record is replete with indications that plaintiff's condition worsened during his final years as a fire marshal and eventually forced him to retire. (Tr. at 59, 72-73, 163-64, 606.)  Moreover, plaintiff was able to keep working due in part to his supervisor, who made exceptions for plaintiff due to his condition. (*Id.* at 31.)  Thus, the record does not support ALJ's Ettinger's determination that plaintiff's work history supported a finding of non-disability.

Second, with respect to plaintiff's failure to seek disability benefits upon his retirement in 1990, ALJ Ettinger's own findings indicate that plaintiff had significant income from two pensions following his retirement. (*Id.* at 253-54.) Moreover, plaintiff has indicated that, during the Relevant Period, he was not fully aware that his symptoms constituted a

47

disorder. (*Id*. at 355, 616-17.)  Thus, it is not surprising that plaintiff did not seek disability benefits for a disorder that he did not fully comprehend.

Finally, the Commissioner places great weight on plaintiff's failure to seek professional treatment for PTSD until 2002. (Def. Reply at 5-6.)  ALJ Ettinger's reliance on plaintiff's delay in treatment, however, fails for several reasons.  First, although plaintiff never sought clinical care during the Relevant Period, he used drugs and alcohol to alleviate his symptoms. (Tr. at 610-11; *see, e.g.*, *Glover v. Barnhart*, No. 06-CV-195, 2009 WL 35290, at *12-13 (N.D.N.Y. Jan. 5, 2009) (finding that letter attesting to claimant's alcohol use was probative of mental health).)  Second, this inference implicates a question best reserved for an impartial medical advisor: namely, whether the symptomatology of PTSD is generally such that a person with severe PTSD would likely or necessarily seek medical treatment.

Third, the cases cited by the Commissioner in support of this evidentiary inference are inapposite, and in no way suggest that lack of treatment, on its own, can support a finding of non-disability.  In both *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989), and *Navan v. Astrue*, 303 F. App'x 18, 20 (2d Cir. 2008), the Second Circuit held that a claimant's failure to seek treatment undermines his disability claim.  In

48

both cases, however, the claimants suffered from serious physical impairments. It is a natural inference that someone with an extremely painful physical impairment would not abstain from clinical treatment. The inference is less plausible for an individual with a mental impairment with symptoms that include social anxiety and isolation. (Tr. at 341.) Moreover, although the Commissioner cites four cases that appear to support the inference of non-disability from the lack of treatment of a mental impairment,[16] these cases are distinguishable because in each case, there was contemporaneous medical evidence indicating that the claimant's alleged impairment lacked sufficient severity to be disabling,[17] whereas there is no such contemporaneous evidence in the instant case. (*Id.* at 252.)

---

[16] *See Gonzalez v. Comm'r of Soc. Sec.*, No. 08-CV-2314, 2009 WL 803121, at *11 (E.D.N.Y. Mar. 25, 2009); *Moscatiello v. Apfel*, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001); *Vitale v. Apfel*, 49 F. Supp. 2d 137, 142-43 (E.D.N.Y. 1999); *Howe-Andrews v. Astrue*, No. CV-05-4539, 2007 WL 1839891, at *9 (E.D.N.Y. June 27, 2007).

[17] In *Gonzalez*, the claimant purported to have depression in 1995, but only sought treatment in 1996; however, after only one month of treatment, the claimant's treating physician told the claimant that "he was doing better," and the claimant did not seek further psychiatric help until after his insured status expired. 2009 WL 803121, at *11. In *Moscatiello*, the claimant did not seek treatment for her alleged mental impairment until more than two years after her insured status expired. 129 F. Supp. 2d at 489. Although the claimant was continuously treated for other disorders during the period when she was allegedly disabled by her mental impairment, "the medical professionals who closely monitored plaintiff did not perceive that she suffered from a disabling mental or emotional condition." *Id.* In *Vitale*, the claimant received medical attention several months after his alleged mental disability onset date; although the physician "offered a diagnosis of severe anxiety and depression related to chronic back pain, there is no evidence of a clinical examination or that she provided or prescribed ongoing therapy." 49 F. Supp. 2d at 143. Finally, in *Howe-Andrews*, the claimant received treatment for anxiety, but her physician prescribed medication that effectively controlled her symptoms, and she did not seek further treatment for two years. 2007 WL 1839891, at *9.

Finally, the Commissioner also cites *Duraku v. Barnhart*, No. 01-CV-310, 2002 WL 31956008 (E.D.N.Y. Dec. 10, 2002).  In *Duraku*, the court denied plaintiff's claim for adult-child disability benefits in part because plaintiff did "not even begin seeing a psychiatrist until . . . five years after" she was last eligible for disability benefits. 2002 WL 31956008 at *4.  The *Duraku* case is readily distinguishable from the instant action because even when the *Duraku* claimant finally sought care, her treating physician did not diagnose her with a severe mental impairment. *Id.*  Here, in contrast, ALJ Ettinger found that plaintiff had a severe impairment as of October 1990 (*i.e.*, the beginning of the Relevant Period), well before plaintiff's insured status expired.  Second, as is true for the other cases cited by the Commissioner on this point, the *Duraku* court considered the lack of treatment as but one factor in the Commissioner's *discrediting* of a claimant's allegations with respect to disability onset.  Neither *Duraku*, nor any other case cited by the Commissioner, provides authority for the proposition that lack of treatment, on its own, is sufficient to find non-disability.

### 2. Dr. Stein's 2010 Letter Affirmatively Indicates that Plaintiff was Disabled During the Relevant Period

After ALJ Ettinger issued his decision, plaintiff submitted a January 2010 letter by Dr. Stein to the Appeals

Council. (Tr. at 224-27.)  Because the 2010 letter relates to

the period before ALJ Ettinger's decision, and was properly

submitted to the Appeals Council, (*id.* at 237-39), it is now

part of the administrative record for review before this court,

*Perez*, 77 F.3d at 45.

Dr. Stein's 2010 letter states that plaintiff's PTSD

was as severe in March 2002 as it was in December 1995. (Tr. at

228-29.)  Although the 2010 letter does not explicitly state

that plaintiff was disabled during the Relevant Period, it does

indicate that plaintiff's condition remained relatively

unchanged from 2002 to 2010. (*Id.* at 229.)  The Commissioner

previously determined that plaintiff was disabled as of January

11, 2005. (*Id.* at 19; *see* note 10, *supra*.)  Thus, the January

2010 Letter implies that plaintiff's PTSD was at least as severe

during the Relevant Period as it was in 2005, when the

Commissioner determined that plaintiff's PTSD became disabling.

Although Dr. Stein's January 2010 letter presents a

retrospective opinion of plaintiff's disorder during the

Relevant Period, the Second Circuit has attributed significant

probative value to retrospective opinions from treating

physicians that are not otherwise undermined by conflicting

medical or circumstantial evidence. *Wagner v. Sec'y of Health &*

*Human Servs.*, 906 F.2d 856, 861-62 (2d Cir. 1990) (noting that

the government was not entitled to disregard a treating

physician's retrospective medical testimony even though there were gaps in the medical record, and the government was suspicious of the physician's ability retrospectively to diagnose the claimant's condition); *see also Rivera v. Sullivan*, 923 F.2d 964, 969 (2d Cir. 1991) (accepting retrospective opinion when there was no contrary medical testimony, and no "overwhelmingly compelling" circumstantial evidence); *Adorno v. Halter,* No. 99-CV-2758, 2002 WL 59422, at *3 (S.D.N.Y. Jan. 16, 2002) ("the diagnosis of . . . a psychiatrist festooned with academic and professional credentials . . . certainly qualifies as a true retrospective diagnosis"; also noting that mental illnesses tend to be progressive and are thereby "particularly well suited to retrospective diagnosis").

Dr. Stein is the Director of the PTSD program at the VANYHHS, (Tr. at 164), and has treated plaintiff since March 2003, (*id*. at 339).  The Commissioner previously accepted Dr. Stein's assessment that plaintiff suffered from PTSD during the Relevant Period. (*Id*. at 252.)  There is no objective medical evidence that contradicts Dr. Stein's retrospective opinion, and the weight of the contrary circumstantial evidence cited by ALJ Ettinger is questionable, as discussed above.  Thus, Dr. Stein's retrospective opinion on plaintiff's condition during the Relevant Period is entitled to significant probative weight.

This conclusion is not undermined by the fact that plaintiff's condition worsened after the September 11 attacks. In *Byam v. Barnhart*, the Second Circuit noted that exacerbation of an impairment does not automatically devalue the weight afforded to a retrospective opinion regarding the severity of that impairment prior to exacerbation:

> We do not rule out the possibility that the plaintiff's condition may have degenerated . . . raising a concern about the retrospective accuracy of [the medical] evaluation. However, in other cases of degenerative conditions and speculative retrospective diagnoses, plaintiffs have won reversals of adverse decisions.

336 F.3d 172, 183 (2d Cir. 2003). Here, plaintiff's condition fluctuated during his years of treatment, and his diagnosis continues to be poor, suggesting that plaintiff's condition was inherently prone to fluctuations due to external stimuli, and that it may have been similarly exacerbated during the Relevant Period.[18] Indeed, plaintiff's wife indicated that plaintiff's condition worsened after the first World Trade Center attack in 1993, which was during the Relevant Period. (Tr. at 236.)

Thus, the Commissioner has not cited substantial evidence in support of his determination that plaintiff was not disabled during the Relevant Period, first, because ALJ Ettinger's evidentiary inferences do not constitute substantial

---

[18] *Compare* Tr. at 320, *with id.* at 314, 317 (indicating that the frequency of plaintiff's panic attacks decreased in December 2003, only to rise drastically between February and March 2004).

evidence in support of that determination and, second, because
Dr. Stein's 2010 letter — the only viable medical evidence with
respect to the severity of plaintiff's PTSD during the Relevant
Period – indicates that plaintiff's PTSD was disabling during
the Relevant Period.

## IV.  Disposition

As detailed above, the Commissioner failed to abide by
SSR 83-20 in determining plaintiff's disability onset date.
Furthermore, the Commissioner's determination that plaintiff was
not disabled during the Relevant Period is not supported by
substantial evidence.  As a result, the court remands this case
to the Commissioner. *Morrison,* 2010 U.S. Dist. LEXIS 115190, at
*19.  The only remaining question is whether this matter should
be remanded for further administrative proceedings, or for the
calculation of benefits.

The Second Circuit in *Curry v. Apfel* held that when
the Commissioner fails to meet his burden under step 5 to show
that a claimant has sufficient RFC to perform work available in
the national economy, "remand for the sole purpose of
calculating an award of benefits is mandated." 209 F.3d 117, 124
(2d Cir. 2000).  *Curry* has since been abrogated by new
regulations promulgated by the SSA on August 26, 2003, 20 C.F.R.
§ 404.1560(c)(2), which clarify that, under step 5, "the
Commissioner need only show that there is work in the national

54

economy that the claimant can do; he need not provide additional
evidence of the claimant's residual functional capacity."[19]
*Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

The Second Circuit has repeatedly declined to decide
whether the new regulations apply retroactively to individuals
such as plaintiff, whose alleged onset dates are prior to August
26, 2003. *Id.* (declining to reach the retroactivity issue, but
noting that there "is some authority that suggests this
contention is without merit, notwithstanding *Bowen v. Georgetown
Univ. Hosp.*, 488 U.S. 204 (1988), because the regulations do not
have the kind of retroactive effect that *Bowen* restricts"); *see
also Mancuso v. Astrue*, 361 F. App'x 176, 177 (2d Cir. 2010)
("We left this [retroactivity] question open in *Poupore* . . .
and need not conclusively decide the issue here . . . ."
(citation omitted)); *Rodriguez v. Astrue*, No. 11-CV-7720, 2012
WL 4477244, at *32 n.70 (S.D.N.Y. Sept. 28, 2012) ("[I]t is an
open question in this Circuit whether the amended regulation
applies retroactively to a claimant whose alleged onset
disability occurred prior to the amendment becoming
effective.").

---

[19] In his opinion, ALJ Ettinger indicated that, at step 5, the Commissioner
only carried a limited burden to show that "other work exists in
significant numbers in the national economy that the claimant can do."
(Tr. at 248.)  Thus, ALJ Ettinger applied the law as it currently stands,
and not its pre-2003 version. 20 C.F.R. § 404.1560(c)(2).

Nevertheless, district courts in this Circuit continue to apply the *Curry* standard to cases in which the claimant's alleged onset date precedes August 26, 2003. *See, e.g.*, *Jones v. Astrue*, No. 09-CV-5577, 2012 WL 4473258, at *4 (S.D.N.Y. Sept. 28, 2012) ("[D]istrict courts within this Circuit have repeatedly explained that the *Curry* standard applies when the onset of disability occurred before the promulgation of 20 C.F.R. § 404.1560(c)(2)."); *Lupo v. Comm'r of Soc. Sec.*, No. 07-CV-4660, 2011 WL 1316105, at *2 (E.D.N.Y. April 4, 2011); *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174, 2011 WL 1004696, at *3 (E.D.N.Y. Mar. 18, 2011); *cf. Ramos v. Astrue*, No. 09-CV-3030, 2010 WL 3325205, at *6 (E.D.N.Y. Aug. 19, 2010). Nonetheless, *Curry*'s obligation to remand for the calculation of benefits applies only to cases "where the reversal is based solely on the [Commissioner's] failure to sustain [his evidentiary] burden . . . [and] no purpose would be served by . . . remanding the case for rehearing." *Curry*, 209 F.3d at 124 (alterations in original) (internal quotation marks omitted). Indeed, "[r]emand for further proceedings is the usual remedy when the record is incomplete or the ALJ has committed legal error." *Melendez v. Astrue*, No. 08-CV-6374, 2010 WL 199266, at *1 (S.D.N.Y. Jan. 20, 2010) (citing *Curry*, 209 F.3d at 124).

Here, the order for remand is based in part on the Commissioner's failure to follow his own regulations in

determining plaintiff's RFC during the Relevant Period, and by extension, plaintiff's disability status under step 5 of the sequential evaluation.  Thus, this case is based on a *qausi*-legal error, and not just a failure by the Commissioner to meet his evidentiary burden.  As a result, this court is not obligated by *Curry* to remand solely for calculation of benefits. *See Brown*, 2011 WL 1004696, at *4, 6 (finding that *Curry* applied, but holding that remand for further proceedings was still appropriate because the Comissioner's error under step 5 was based on his failure to follow relevant SSA regulations); *Villanueva v. Barnhart*, No. 03-CV-9021, 2005 WL 22846, at *13 (S.D.N.Y. Jan. 3, 2005) (notwithstanding *Curry*, "remand solely for the calculation of benefits would not be appropriate on the current incomplete record, and further findings may support the Commissioner's decision").  Remand would allow the Commissioner to revisit and incorporate into his analysis the findings of his medical advisor, Dr. Jusino, or call upon the services of another medical advisor willing to make a medical inference regarding plaintiff's disability onset date, which would "plainly help to assure the proper disposition of [plaintiff's] claim." *Kirkland*, 2008 WL 267429, at *8 (internal quotation marks omitted).  Thus, a clear purpose would be served by additional proceedings below.

Furthermore, application of the correct legal standards will not lead to only one potential result. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand."). Although Dr. Stein's 2010 letter strongly suggests that plaintiff was disabled during the Relevant Period, the presumption favoring a treating physician's diagnosis can be rebutted by evidence in the record identified by the Commissioner. *Halloran,* 362 F.3d at 32 (2d Cir. 2004) ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ."). If the ALJ finds that the 2010 letter is ambiguous or contradicted by the record, he would be obligated to supplement the record with additional testimony from Dr. Stein with respect the severity of plaintiff's condition during the Relevant Period. *Stokes*, 2012 WL 1067660, at *13. At this point, the court cannot predict how such additional testimony may effect the disability determination. Thus, application of the correct legal principles by the ALJ on remand would not necessarily lead to one result.

## CONCLUSION

For the foregoing reasons, the court denies the parties' cross-motions for judgment on the pleadings and remands this case to the Commissioner for additional administrative proceedings consistent with this opinion.  In particular, the ALJ on remand should consider the retrospective opinion of Dr. Stein as provided in his January 2010 letter.  If the ALJ determines that there are any ambiguities or inconsistencies in the record regarding plaintiff's disability onset date, the ALJ should call upon Dr. Stein, or another medical advisor, to provide further evidence, including testimony with respect to the severity of plaintiff's PTSD during the Relevant Period, and should revisit and discuss Dr. Jusino's testimony regarding plaintiff's disability onset date.

To the extent that the ALJ rejects either Dr. Stein's or Dr. Jusino's medical testimony, the ALJ should clearly articulate his reasons for doing so and support those reasons with citations to the record.  The ALJ should also consult and apply SSR 83-20 in making his decision with respect to the onset date of plaintiff's disability, bearing in mind that the disability onset date ultimately determined by the ALJ must be the product of an "informed judgment" and have a "legitimate medical basis."

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:      March 17, 2013
            Brooklyn, New York

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York

60